The lower court in a written opinion has set forth the issues in this case and, in our opinion, has correctly determined them. The opinion is as follows:
"Plaintiff, Adam Ponthieu, seeks to recover damages from the defendant, L. Willard Coco, in the sum of $16,460.95, claiming that he was shot in the back by defendant unlawfully and without provocation on Sunday, July 26, 1942. The various items of damages claimed by plaintiff are itemized in Article II of his petition.
"Plaintiff claims that on that Sunday morning, in accordance with a time-honored custom, he left his home at Big Bend, Louisiana, situated about two and one-half miles beyond the home of his father, Telisma Ponthieu, to pay his father and mother his usual Sunday visit. Mr. Telisma Ponthieu lives about five or six miles below Bordelonville, Louisiana. The defendant, L. Willard Coco, lives about three miles above Bordelonville, making the distance from the defendant's home and that of Telisma Ponthieu eight miles more or less. Wilson Ponthieu, a brother of plaintiff and also a son of Telisma Ponthieu, lives next door to his father's home, a short distance beyond. All parties live on what is known as the right descending bank of Bayou des Glaises. It is alleged and admitted by plaintiff and defendant that the following parties were at the home of plaintiff's father on the Sunday morning when the shooting took place: Mr. and Mrs. Telisma Ponthieu, Wilson Ponthieu and his five-year-old daughter, Oliver Bordelon, an uncle of the plaintiff, and the plaintiff. Adam Ponthieu was in his father's barn lot changing the tires on his automobile, a distance of probably 350 feet from the road, where the shooting took place.
"It is further alleged that between the hours of eight-thirty and nine that Sunday morning, the defendant accompanied by one Ellis Desselles, drove in front of the home of plaintiff's father and stopped his car about forty feet beyond the small front gate on the right-hand side of the gravel road facing down the Bayou, and after coming to a stop, blew the horn of his automobile. Wilson Ponthieu testified that when he heard the automobile horn, he stepped out of the living room onto the front porch of his father's home and Ellis Desselles signaled or waved to him to come to the car, which he did accompanied by his little girl. As he reached defendant's car, he testified that defendant got out and they met and exchanged greeting in the rear of defendant's car; that defendant reproached and reprimanded Wilson Ponthieu for irregularities and discrepancies in the measurement of defendant's land, which measurement is required under the rules and regulations of the Triple A. Whereupon Wilson Ponthieu told the defendant that he had not measured his land because he had complained so bitterly of a previous measurement. Wilson Ponthieu testified that when he apprised the defendant that he had not surveyed his land because of his complaint the year previous, defendant flew into a rage and replied that he, Wilson Ponthieu, was a `God Damn Liar and a Son of a Bitch', and Ponthieu says he replied, — `Then in that case you are another God Damn Liar and a Son of a Bitch', and as the last word died from his lips, the defendant struck at him and hit him on the left side of the head. Wilson Ponthieu then straightened himself up and struck back at the defendant but missed him.
"Wilson Ponthieu further testified that at this juncture his mother came out of the home asking defendant to leave the scene, which he ascribes to the fact that his mother heard his little girl crying and screaming while he and defendant were scuffling near the automobile. He further testified that defendant stepped toward the right-hand side of the car, passed in front of it and went to the left side of said car in a belligerent attitude, and after the exchange of words, entered his automobile, which was facing the direction of Big Bend, pointed the front of his car toward the levee, backed his car on the gravel road and turned it back in the direction of Bordelonville. In the meantime, plaintiff left from where he was adjusting the tires of his automobile 350 feet away, and came to a side gate between the lot and the front yard, about 77 feet away from the small foot bridge in front of the home, this after having heard some loud talking and cursing by the defendant L. Willard Coco. He further testified that when the defendant saw him, he left his position in the rear of the car and ran in front of same and got into *Page 353 
it from the left front door, and it was at this point he says he called to defendant in a conciliatory tone, saying — `Do not run off, Willard, let us straighten this matter over', but that the defendant did not stop, but got in his car and backed up and drove towards Bordelonville, in the direction from which he had originally come; that defendant cut his car to the left of the bridge in front of his father's home, where he and Wilson Ponthieu and his little girl were standing in the road, and drove his car in such a manner that had not his brother, Wilson, grabbed him by the shoulders and pulled him out of the way, the defendant would have passed over him because in spite of the efforts of his brother in pulling him out of the pathway of the on-coming car, the left fender of defendant's automobile struck him and as it did, he struck at defendant while he was seated in his car.
"Plaintiff further says that it was only after the defendant attempted to pass over him that he struck at him. The testimony of the plaintiff and his brother, Wilson, is to the effect that up to this time (that is when defendant tried to pass over the plaintiff), they considered the incident a closed one but that the defendant, after having been struck or struck at by the plaintiff, drove his car about 35 feet from him (the point where plaintiff stood when he struck him), stopped his car, got out with a pistol in his hands and shot him; that when plaintiff saw defendant alight from his car with his pistol in his hand, he threw up his hands and as the defendant approached him, pleaded with him not to shoot him, that `he was unarmed and could not protect himself'; that defendant disregarded his pleadings and when he leveled his gun at him he turned his back and as he turned a shot was fired into his left back hip and finally imbedded itself into the fleshy part of his right hip.
"The only other two witnesses on behalf of the plaintiff who were present at the shooting are the defendant's mother and Oliver Bordelon, and apparently they were so excited they were unable to distinctly recall the incident sufficiently well to give an exact and detailed version of this matter except to corroborate the testimony of the plaintiff and Wilson Ponthieu in a few minor details which the Court does not believe are very pertinent in this case.
"It is well to note from the testimony of all the witnesses that both plaintiff and defendant are powerful men in stature, both measuring over six feet and weighing over 200 pounds each. Consequently, man to man, it may well be said that they were evenly matched, except that the plaintiff is under thirty years of age and the defendant is over fifty. The defendant was tried by a bill of information filed by the District Attorney for the crime of shooting with intent to commit murder and was convicted for the offense of shooting with intent to kill, and this Court sentenced him to serve a period of three years in the State Penitentiary, which sentence he is now serving.
"Plaintiff further alleges that because of this unprovoked shooting of him by the defendant, he has suffered intense pains, humiliation, discomfort and inconvenience, and he still suffers as a result thereof, and he fears he will never feel the same as he felt before the shooting; that he still suffers a constant pain as a result of the bullet never having been removed from his body, and that he has become irritable, nervous and at times nauseated, causing frequent indigestions, making wholly unfit to attend to his normal duties as heretofore; that he is a man of prominence and having had to undergo the humiliation of not fully resenting this shooting by even taking the law into his own hands, he is ashamed and will not face crowds and his friends for fear he will be pointed out as he said `the man Willard Coco shot', and consequently he is entitled to the damages asked in his petition.
"Plaintiff alleges that he did not provoke the difficulty that finally led into the shooting, but that the defendant did so and now tries to justify the shooting because of fear of receiving bodily harm. He further alleges that the defendant, Willard Coco, was the aggressor from the time plaintiff addressed him in a conciliatory tone up to the time of the shooting, and that plaintiff at no time provoked the difficulty, and cited as his authorities therefor some Louisiana jurisprudence and especially the case of Randall v. Ridgley [La.App]., 185 So. 632; the American Jurisprudence, Vol. 4, Verbo Assault and Battery, Section 51, page 153. He further cited the case of Newman v. Southern Kraft Corporation [La.App.] 197 So. 197.
"Plaintiff's counsel further argued that even though Willard Coco, the defendant herein, had not been the aggressor and that plaintiff had provoked the difficulty, *Page 354 
the defendant is liable as an aggressor, because he used excessive force and more so than that which the law tolerates for defensive purposes. The Court sees no similarity in the above cited case with the present one. In the Newman v. Southern Kraft Corporation case the defendant's employee and not the plaintiff provoked the difficulty which finally led to the assault.
"The defendant answers plaintiff's petition denying that he provoked the difficulty or was at any time the aggressor therein, but on the contrary he alleges that he left his home at Bordelonville that Sunday morning to make a round on Bayou des Glaises and Big Bend in his capacity as game warden to ascertain if anyone was violating the Conservation laws, there being quite a good many grosbecks in that vicinity at the time of the year, and in the trial of this case he produced a commission as such from the State of Louisiana and of the Federal Government. That as he left home, he took along with him some merchandise he had for one Ellis Desselles, who lived just beyond Bordelonville, and after he stopped at Ellis Desselles' home and informed Desselles of his destination, Desselles asked him to permit him to accompany him because he knew they had to pass in front of Mrs. Florian Laborde's home and that he wanted to see her about a butcher bill he owed her. Coincidently with the mention of this fact by Desselles, the defendant says he was reminded that while down the Bayou, he would also stop at Wilson Ponthieu's home to discuss with him the measuring of his cotton acreage; that accordingly they stopped at Mrs. Florian Laborde's home and from there they continued down the Bayou, and just as they were about to pass the home of Telisma Ponthieu, Wilson's father, Ellis Desselles recognized Wilson's automobile in his yard and surmised Wilson Ponthieu might be at his father's home and so conveyed his thoughts to defendant, and he thereupon immediately applied the brakes of his car and stopped it about fifty feet beyond the foot bridge in front of Telisma's house, as already hereinabove related; that upon sounding the horn of his car, Wilson Ponthieu came out and Desselles signaled over to him to come out to the car. Desselles testified he remained in the car and sat on the right hand side with the door opened and his feet resting on the runningboard, and as Wilson Ponthieu approached the car, the defendant got out, walked to the rear where the said Wilson and the defendant met and engaged in a conversation, but that he is unable to recall just what was said and done, except to say a heated discussion took place between the two about a measurement of defendant's cotton land, and he does say that Wilson Ponthieu told the defendant he had not measured his land but that Lloyd Couvillon had done so, because he (the defendant) had raised so much hell about his work the year before, he did not want to have anything to do with it and what has already been related took place, and the next thing he saw was that the defendant, after his trouble with Wilson Ponthieu, got back into his car, which was at the time facing Big Bend, turned it around completely and started back in the direction of Bordelonville, from whence they came, and that he did see Adam Ponthieu, the plaintiff, and Wilson Ponthieu, his brother, who were then standing in the road, rush to the defendant while he was seated in his car at the steering wheel driving back in the direction of his home, and in the fear of probably getting hit himself, he ducked his head and while he is unable to state definitely if the plaintiff struck the defendant with much force, he is positive in his testimony that the defendant leaned over towards him as if to avoid being struck while driving away from the scene, and that through some unexplainable way after the defendant was struck by the plaintiff, the defendant's car ran into a ditch about fifty or sixty feet from the front gate and stuck in said ditch.
"The defendant further testified that when he saw himself in this predicament (his car being stuck in the ditch), he got out of his car and as he did so, the plaintiff and his brother, Wilson Ponthieu, began rushing him while he was pleading with them not to come any closer to him. That when plaintiff continued advancing on him, he turned around and reached for his pistol, which was lying on the floor in the front part of the car, and as he continued advancing on him in a belligerent attitude, he fired one shot and as he did, the plaintiff turned around and went in a direction across the road from where he was shot.
"The defendant further testified that at the very moment he and Wilson Ponthieu began their argument and the scuffle between them ensued, plaintiff's mother began calling the plaintiff to come out from where *Page 355 
he was and help Wilson kill the `fils putin' (Son of a Bitch).
"It is admitted by both plaintiff and defendant that prior to this difficulty they were on good terms. Whether the defendant left his home that Sunday morning for the purpose assigned by him or to see Wilson Ponthieu about his cotton measurement is of little or no moment in the Court's opinion. The defendant had a right to do either or both so long as he conducted himself in a manner becoming his station in life. If, as he says, he went out on a visit down the Bayou in his capacity as game warden, he had a right to have a pistol in his car, as well as the right to discuss with Wilson Ponthieu what he says he did discuss with him. The defendant and Wilson, it is admitted, did have some trouble and even struck at each other, and from the testimony of all the witnesses after the trouble was over, the defendant got in his car and started to leave and did leave from the scene of the original trouble, driving at what he says about four miles an hour in the direction of his home. He did what any other reasonable and prudent man should have done, under such circumstances, thus indicating he did not want further trouble and especially so when he saw Adam Ponthieu, the plaintiff and a brother of the man with whom he had just had a difficulty coming in the direction of him.
"The plaintiff himself admits he left work on his car about 350 feet away to `come see what was going on', and that he told the defendant as he was driving away, — `wait, Willard, do not run off, let us talk this thing over.' He further admits that as the defendant passed him or tried to run over him, he struck or struck at him while he was in his car and driving away from the scene, and says, `if I had struck him he never would have shot me', apparently conveying the impression that he struck at him with such force that if the blow had met its mark it would have been made with such force and violence that the defendant would have been knocked out. Does this indicate the attitude of plaintiff on that occasion as being one of friendliness or hostility? The Court cannot but believe the latter. While it is true that this defendant has been in trouble before, the Court permitted the introduction of this line of evidence because in the event, after all evidence had been adduced by both plaintiff and defendant, there had been any doubt in the Court's mind as to who was the aggressor, under the jurisprudence of common law, it would probably have enabled the Court to determine that fact based upon his previous general reputation, but the evidence in this case does not justify that fact.
"There has been some conflict of testimony by plaintiff's witnesses and such is always the case, but realizing as the Court does that the question and proposition of law which the Court is called upon to decide is whether or not from the evidence adduced the plaintiff by his own conduct on that occasion was at fault in leaving his work on his automobile 350 feet away and calling to the defendant to stop when he was leaving the scene. The Court is satisfied if the plaintiff had not come out in the road and called out to defendant to wait, but had remained at his post working on his automobile, the original trouble would have ended. But when he came out and called him to stop and struck at the defendant while he was in his car driving away, he provoked the difficulty that finally led to the shooting of the plaintiff by the defendant. If he provoked the difficulty, under the Louisiana Doctrine of Tort Law, he cannot recover the damages.
"Defendant has cited a number of cases on this very subject and lays particular stress on the case of Miller v. Meche,111 La. 143 [35 So. 491], in which the circumstances are somewhat similar to this case. He cites a more recent decision of the Louisiana Circuit Court of Appeal, Finkelstein et al. v. Naihaus, 151 So. 686, and other authorities which the Court deems unnecessary to recite. Additionally thereto, the Circuit Court of Appeal, as late as December 21, 1943, in the case of Manuel v. Ardoin,16 So.2d 72, again reiterates the Louisiana jurisprudence and adheres strictly to the doctrine already established that one provoking a difficulty with another cannot recover damages from him for assault, though the assault was not legally justified.
"The courts of Louisiana have consistently held that before a plaintiff can recover damages under such circumstances, it must be affirmatively shown that the plaintiff did not provoke the difficulty or was not at fault in provoking it, and in this case the Court is satisfied from the evidence adduced by the witnesses of both plaintiff and defendant, there is no question in the Court's mind that the plaintiff *Page 356 
and not the defendant provoked the difficulty and was the aggressor in the unfortunate shooting. Plaintiff provoked same when he left the scene where he was working on his automobile 350 feet away, called out to the defendant not to leave, walked into the road and as the defendant was driving away, struck at him with such force and violence that from his own testimony, if he had hit him, the defendant would not have been able to shoot him. The Court, therefore, is of the opinion that the plaintiff and not defendant provoked this difficulty which finally brought about this shooting. Because of that fact, together with the requirement of the Louisiana Doctrine of Tort Law that before a plaintiff can recover it must be shown that he did not provoke the difficulty, and the Court having satisfied itself that defendant at no time provoked the same, it is of the opinion that plaintiff's demand should be rejected at his costs, and it is so decreed.
"Let there be judgment, therefore, rejecting plaintiff's demands at his costs."
The judgment was signed in accord with this opinion and plaintiff is now prosecuting this appeal.
We have carefully studied the record and are convinced, as was the lower Court, that plaintiff was the aggressor. Defendant's affray with plaintiff's brother, Wilson, was over and defendant had re-entered his car, turned it around and started towards his home when the plaintiff appeared on the scene and asked him to stop and discuss the trouble. Defendant did not reply and did not stop when he drove past plaintiff struck at him. The record fails to disclose that defendant had said one word to plaintiff or had done anything to him up until that time. Although defendant was not justified in criminal law in shooting plaintiff, it is clear beyond doubt that the difficulty between them which led up to the shooting, was provoked by plaintiff and not the defendant.
We give little credence to the claim made by plaintiff that defendant attempted to run over him with his automobile. All the testimony shows defendant's car was only traveling four or five miles per hour and no one claimed he attempted to speed it up any. Furthermore, there was no reason for defendant to attempt to harm plaintiff at that time. They had not had any trouble and were on friendly terms. Although defendant was not justified in law in shooting plaintiff and was no doubt correctly convicted of shooting with intent to kill, which verdict is comparable to a verdict of manslaughter in a death case, under the majority jurisprudence of this State, plaintiff, who provoked the difficulty, cannot recover in a civil suit against his assailant.
We fail to find error in the judgment of the lower court, and it is affirmed, with costs.