45 So.2d 902 (1950)
BRITT et al.
v.
MERRITT et al.
No. 7409.
Court of Appeal of Louisiana, Second Circuit.
April 5, 1950.
Rehearing Denied April 28, 1950.
*903 John P. Godfrey, Many, for plaintiffs-appellants.
Fraser & Fraser, J. Reuel Boone, Olin D. Moore, Many, for defendants-appellants.
TALIAFERRO, Judge.
This case was before us heretofore on appeal from a judgment that sustained exceptions of no cause and no right of action. The judgment was reversed and the case remanded for further proceedings. 35 So. 2d 281.
To lay the foundation for intelligent discussion of the exceptions the salient articles of the petition were quoted in our former opinion. We shall not repeat them here, but, for the purposes of this opinion, shall give a general summary of them.
Defendant, C. C. Merritt, the afternoon of March 30, 1947, on a highway in Sabine Parish, Louisiana, shot and killed Warren M. Britt, the husband and father of the plaintiffs. At the time of the killing Merritt held a commission (in writing) from T. M. Phillips, Sheriff of Sabine Parish, as deputy sheriff, wherein it is said: "That C. C. Merritt is fully clothed with legal authority to perform as Deputy Sheriff of said Parish."
This suit is against Merritt, the sheriff and the surety on his official bond, The Maryland Casualty Company. It is predicated upon the theory that in taking the life of Britt, Merritt was acting in his official capacity as deputy sheriff, but violated his duty by an "unfaithful or improper performance of an official act". In other words, that he was attempting to perform an official duty within the purview of his office, but violated that duty by employing means and methods to accomplish the arrest of the deceased that were not only wholly unwarranted in law but violently repugnant thereto.
The facts alleged to support the action mainly appear in articles five and six of the petition, which we analize as follows, viz: That the deceased drove his jeep to the home of Ivy Morris in the Pendleton community of Sabine Parish where Merritt was serving as deputy sheriff; that Merritt became aware of Britt's presence, armed himself with a ten-guage shotgun, walked some two hundred yards down the road he knew deceased would have to travel when en route to his home, got behind a tree on the roadside and as the jeep approached he stepped from behind said tree and ordered Britt to halt; that his purpose in so doing was to search the vehicle for intoxicating liquors which deceased was suspected of transporting; that when Britt failed to halt as ordered, Merritt fired, in quick order, three shots toward him from the last of which, wounds were inflicted that caused death two days later.
Answering the petition, Merritt, in effect, generally denies the allegations thereof *904 upon which plaintiffs depend for success herein, except he does admit firing the shot that took the life of Britt at the time and place alleged.
Further pleading, Merritt charges that some days prior to the killing, Britt, who he knew held ill will against him, made threats against his life to several persons, which were communicated to him; that immediately prior to the killing he was walking along the road leading from his home to Sabine River when the deceased drove into the road behind him, and tried to run the jeep over him; and "That respondent stepped out of the road and called upon Britt to stop; that Britt continued to drive his jeep directly toward respondent while reaching in the rear of the jeep as if to draw a weapon, which was his practice to carry with him, and respondent being in fear of his life shot Britt in order to save himself from death or great bodily harm."
The sheriff and his surety resist the suit on the ground, as by them alleged, that when Merritt killed Britt he was not acting in the capacity of deputy sheriff nor "in any other official capacity by authority or under direction of T. M. Phillips, Sheriff"; and while Merritt's appointment as deputy sheriff, as alleged, is admitted, they aver that he was only "authorized to serve as such when called upon" by the sheriff to do so.
The Court sustained the defense of the sheriff and his surety but rejected Merritt's alleged excuse for taking the life of Britt. Judgment against him in favor of Mrs. Britt in the sum of Three Thousand ($3,000.00) Dollars, plus medical, hospital and funeral expenses, was awarded; and in favor of each of the five minors for Six Hundred ($600.00) Dollars. Merritt and plaintiffs appealed.
The trial judge gave written reasons for the judgments he rendered. Concerning the case against Merritt he made factual findings as follows, to-wit:
"The testimony of Merritt under cross examination is that on the Sunday afternoon of the homicide, as he was returning home with his family from Texas, he stopped at a friend's house and while there he saw Britt pass. Merritt went home, got a ten gauge shot gun loaded with shells which contained a mixture of buck and squirrel shot, and started walking South on the road toward the home of his tenant, Carvee Phillips. Merritt looked back north and at some distance saw Britt traveling the road in a jeep coming from toward Ivy Morris' and that he, Merritt, turned and continued walking south on the road. That Merritt turned again toward the direction in which Britt was coming and saw Britt, some seventy-five (75) or ninety (90) feet away and began shooting. The medical testimony shows that one buck shot went in the back of Britt's head just left of the mid-line and ranged forward lodging near the left eye; that two buck shot went in the upper part of Britt's back just to the right of the mid-line, and one buck shot and some two or three squirrel shot hit Britt in the back of the right shoulder.
"The defense of Merritt is twofold: He contends that he became alarmed by the fact that Britt was coming toward him and he was afraid he might be run over. Coupled with this, Merritt says Britt reached back as if to get a gun whereupon he shot Britt.
"The defense that Britt was trying to run over Merritt and at the same time was reaching back for a weapon is, as we see it, an inconsistent defense. As the road was narrow and through a wooded section, it appears that Merritt could have very easily avoided being run over by simply stepping out of the road as he testified he had done two (2) or three (3) times in the past. It is customary for pedestrians to give the right of way to motor vehicles on the highway or regularly traveled dirt roads. If Merritt was concerned about avoiding trouble with Britt, to the extent that he purchased a residence at Many, Louisiana, with the intention of moving there, surely he could have stepped out into the woods rather than kill the man if he thought he was about to be run over.
"As to the proposition that Merritt had reason to believe that Britt was about to kill him because he reached back as if to get a gun, we will say that while we know very little about firearms and do not know *905 what effect the mixing of buck and squirrel shot in a shell would have, it is a matter of common knowledge that at a range of seventy-five (75) or ninety (90) feet a person armed with a ten gauge shot gun loaded with buck shot has the decided advantage over one armed with a .22 rifle or pistol, these being the two weapons that defendant claims Britt was in the habit of carrying. Furthermore, a person standing on the ground has an advantage of one traveling by automobile in a shooting affray. Merritt says he saw Britt reach back but he does not testify that he ever saw anything that looked like a weapon, and after the jeep came to a stop, lodged between two trees, and Britt lay mortally wounded only a few feet from the road, Merritt passed the jeep three (3) times and did not look in or examine the jeep to see if a weapon could be found.
"The law of self-defense is set forth in article 20 of the Louisiana Criminal Code which reads in part as follows: `A homicide is justifiable (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.'
"In connection with this case the writer has reviewed several criminal law text books on the question of self-defense. The law of self-defense resolves itself down to this: It is not what the timid man nor the unusually courageous man would have done, but what the average man would have done under like or similar circumstances.
"If it had been shown that Britt was a desperado and expert marksman; that he habitually carried firearms; and, that he had made threats which were communicated to Merritt that he would shoot him on sight, there might have been some justification for Merritt shooting Britt in the manner and method that he did, otherwise not. It is not shown that either of these situations existed. The most that can be said is that the evidence shows Britt to have been an undesirable citizen, but this does not, in itself, justify taking human life."
We find ourselves in complete accord with the conclusions of fact embodied in the foregoing quotation, but disagree with some of the conclusions of law therein, particularly that the rule and principal of criminal law enunciated in Article 20 of the Louisiana Criminal Code has application to a civil suit for damages resulting from death or the infliction of bodily injury by one person upon another.
It is entirely possible under the jurisprudence of this state for a person to be properly charged with and convicted of the killing of another, or of inflicting great bodily harm upon him, and the injured person or his heirs, in case of his death, be without recourse civilly against the person so charged and convicted. This happens when the deceased or injured person provokes, instigates or creates conditions by words or action, of such character as to make him the aggressor in the difficulty out of which the action is alleged to have arisen. For instance, a man may, without provocation, violently strike another with his fist, they being equal or nearly so in physical strength, and if the one struck should with a pistol shoot his assailant and is thereafter charged with and convicted of the shooting, the injured man, the one who started the difficulty being the aggressor, is without right to recover civil damages from the other. The fact that the other man is not excusable for his offense is immaterial in the civil phase of the case. See: Oakes v. H. Weil Baking Co. 174 La. 770, 141 So. 456, and cases cited therein; Massett v. Keff, 116 La. 1107, 41 So. 330; Miller v. Meche, 111 La. 143, 35 So. 491; Welch v. Van Valkenburgh, La.App., 189 So. 297; Ponthieu v. Coco, La.App., 18 So.2d 351; McCurdy v. City Cab Co., La. App., 32 So.2d 720; Finkelstein v. Naihaus, La.App., 151 So. 686.
Merritt's testimony with respect to the shooting and the circumstances under which and the reasons why it was done, abounds in absurdities, inconsistencies and contradictions. According to his version of the facts Britt had not passed him when the last shot was fired, yet the fatal shot put one buckshot through the back of his head and several in his back and shoulder. *906 This shot without question was fired when Merritt was behind the jeep. The first shot, it is reasonable to conclude, missed the jeep entirely; the second was at close range (Merritt says eight or ten feet). The charge entered the right front seat, twelve inches above the cushion and made exit without scattering. Surely, when the third shot was fired, there was no danger to Merritt from being run over by the jeep and surely Britt was not then in the attitude of reaching backward as for a weapon.
It is shown that Britt on several occasions threatened harm to Merritt, which threats were communicated to him, but the fact that he had made the threats rather promiscuously and had made no serious effort to enforce them creates the impression that he never really intended to do so. He was a sort of braggart and doubtless wished to intimidate Merritt. Anyway, the trial judge decided there was no overt act or hostile demonstration against Merritt by Britt and we fully agree with this conclusion.
It would require reckless courage and daring on the part of a driver of a motor vehicle to wilfully try to run over a pedestrian armed with a shotgun on a highway, especially when the one so armed was holloing "Stop", "Halt", etc. at the driver.
The clear preponderance of the evidence exonerates the deceased of the charge of being the aggressor.
In view of the foregoing conclusions the question logically arises: Why did Merritt shoot Britt? The answer is equivocal. He either wilfully murdered him or shot him while acting in the capacity of deputy sheriff, in furtherance of the desire to stop him at any cost and search the vehicle for contraband liquor. The question now looms: Which of the two theories is the more logical and probable? We believe the latter is. The evidence in the case supports this view. No person will be presumed to wilfully desire to take human life.
Britt, it is not denied, to the knowledge of nearly everyone in his community, habitually engaged in transporting from Texas and selling (bootlegging), in violation of law, beer and whiskey. His activities were not confined to the community in which he and Merritt lived. His reputation as a petty law violator was well known. It gave the community considerable concern. His jeep and his home were often searched by deputy sheriffs for spirituous liquors. He blamed Merritt for much of this.
As found by the lower Court, on the afternoon of March 30, 1947, a very brief time prior to the killing, Merritt returned from a trip with his family from across Sabine River. Prior to arriving at his home he saw Britt in the jeep. He tarried for only a few minutes at his home, then picked up his ten gauge shotgun, loaded with buckshot, and began walking down the road that led to his tenant's house, some three hundred or four hundred yards away, over which Britt was known to often travel, and which Merritt had just traveled. And why he should immediately, well armed, desire to again traverse that same road, the record does not satisfactorily disclose. He does say that he carried the gun for his protection.
In his answer Merritt alleged that when he observed that Britt intended to run him down, he stepped out of the road and holled to him to "stop". He testified that when he saw Britt reaching as for a weapon, he yelled at him: "Don't do it." His tenant, Phillips, whose home was not over one hundred fifty yards distant, says that he heard Merritt utter loudly one word in an instant prior to the shooting, but he did not understand exactly the word used. Plaintiffs contend that the word was "Halt", the customary hail by an officer to one in motion he wishes to arrest. This contention, in view of all the circumstances of the case, is quite persuasive.
We conclude that Merritt's purpose in arming himself and immediately leaving his home afoot after returning from the Texas trip, was to halt Britt if they met, search the jeep and arrest him if it contained spirituous liquors. The first shot hit neither Britt nor the jeep, and was likely fired in the hope of frightening him into stopping; and seeing that Britt was, perhaps, contemptuous of his action *907 and did not intend to stop, confirmed in Merritt's mind that he was transporting contraband liquors. His mental processes were moving rapidly. Not unlikely he was enraged at Britt's refusal to heed his effort to stop him. It is fair to conclude that he decided, as many deputies would erroneously have done, that he was authorized to effect arrest even though it required the most drastic methods.
In view of the broad language of the commission to Merritt, to warrant holding that he was not authorized thereunder to arrest one suspected of being in the act of violating liquors laws, unless specially authorized by the sheriff, the evidence would have to be unusually strong, clear and convincing.
There is dispute as to why Merritt was appointed deputy sheriff. He contends, and so does Sheriff Phillips, that the appointment was made at the request of several citizens of the community who wished to have a peace officer present at church gatherings. None of the mentioned citizens testified on the subject. The community is rather remote, being eighteen miles from Many, the parish seat. One witness, obviously impartial, testified that the sheriff told him he appointed Merritt to serve at church services, but had instructed him "if he had a chance to help them out in catching Britt, to help them." Merritt was paid a salary of $35.00 per week. It is difficult to believe that such a substantial compensation would be paid a deputy sheriff simply to be present at church services, which perhaps occurred only a few times each month.
Merritt's commission, it will be recalled, embraced the entire parish. It, in legal effect, conferred upon him the authority to function parish wide. It seems to us to be conceded that he had the authority to search for and seize contraband liquor, without warrant, anywhere in the parish, when transported in a motor vehicle, and arrest anyone in whose possession such liquors were found. It is shown that he did act as deputy sheriff for several days in a community other than his own.
It is also contended that notwithstanding the comprehensive language of the commission, Merritt had no authority from the sheriff to effect the arrest of persons suspected of violating state or parish liquor laws, except after communicating with the sheriff and being expressly authorized by him to do so. This does not strike us as being a reasonable policy nor of usual practice by sheriffs. Certainly such a rule would greatly hinder and handicap a deputy in the discharge of his duties. While trying to communicate with the sherriff, a criminal or suspected person could well escape.
We also conclude that Merritt was clothed with legal authority to arrest Britt or any other person suspected of transporting contraband liquors for sale, and make search therefor; and that he was so acting when Britt was shot.
In our former opinion in this case we cited and analyzed several cases that involved actions against sheriffs because of alleged violation of duty by a deputy. The case of Sanders v. Humphries, 143 La. 43, 78 So. 168, 169 clearly announces the law pertinent to such cases. It is: "But neither the sheriff nor the surety on his official bond is responsible for a wrongful act of a deputy sheriff unless it was done in violation or in an unfaithful or improper performance of an official duty."
Of course, the converse of this legal principle is correct. If a deputy's act is one in violation of an official duty or if he unfaithfully or improperly performs an official act in order to accomplish a desired end, and death or injury results, the sheriff and his surety on his bond are responsible in damages therefor.
Plaintiffs offered in evidence the report and findings of the Coroner's Jury to prove facts other than the date, the fact and cause of death to which objection was made. The objection was sustained. Complaint of the ruling is made here. It was correct. Johnson v. Sundbery, La.App., 150 So. 299.
Britt was thirty-six years of age when killed. While his income was not large, for this day and time, it was sufficient to provide support for his wife and *908 five children, the oldest of whom now is nine years of age.
All things considered, we are of the opinion that the amount of damages due plaintiffs, as determined by the lower court, is too conservative. Regardless of the shortcomings of the deceased, his wife and children by his untimely death have suffered and will suffer damages in an amount in excess of that fixed by the trial judge. We think Twelve Thousand ($12,000.00) Dollars will more nearly meet the ends of justice.
The sheriff's bond is for $6,000.00. This is the limit of the surety's liability.
Therefore, for the reasons herein assigned, the judgment rejecting plaintiffs' demand against T. M. Phillips and the Maryland Casualty Company is annulled, avoided and reversed; and the judgment in favor of plaintiffs and against C. C. Merritt is set aside. And for said reasons, it is now ordered, adjudged and decreed that plaintiff, Rosie Turnley Britt, do have and recover judgment, in solido, against the defendants, C. C. Merritt, T. M. Phillips and the Maryland Casualty Company, in the sum of Three Thousand and No/100 ($3,000.00) Dollars.
It is further ordered, adjudged and decreed that plaintiff, Rosie Turnley Britt, do have and recover judgment, in solido, against defendants C. C. Merritt and T. M. Phillips in the sum of Three Thousand and No/100 ($3,000.00) Dollars.
It is further ordered, adjudged and decreed that Mrs. Rosie Turnley Britt, as natural tutrix of her five minor children, to-wit: Mary Bell Britt, Douglas Britt, Molly Britt, William Huey Britt and Warren Harlond Britt, do have and recover judgment against C. C. Merritt, T. M. Phillips and the Maryland Casualty Company, in solido, in the sum of Three Thousand and No/100 ($3,000.00) Dollars, being Six Hundred ($600.00) Dollars for each minor.
It is further ordered, adjudged and decreed that Mrs. Rosie Turnley Britt, as natural tutrix of her said five minor children, do have and recover judgment against C. C. Merritt and T. M. Phillips, in solido, in the sum of Three Thousand and No/100 ($3,000.00) Dollars, being Six Hundred ($600.00) Dollars for each minor.
It is further ordered, adjudged and decreed that interest at the legal rate on all of said judgments run from judicial demand. And, that defendants pay all costs of suit.