ELLIS, Judge.
On July 21, 1949, Oliver Esnault, Jr., a colored man, was shot and killed by the defendant, Oscar J. Richard, and his wife filed this suit for damages alleging that the defendant wrongfully, unlawfully, wil-fully and wantonly killed her said husband; that the said killing was without provocation or justification, and that petitioner’s said husband was in no way at fault.
The defense to the suit is set up in defendant’s answer as follows:
“7. On several occasions during a period of approximately six or seven months prior to July 21, 1949, said Oliver Esnault, Jr., had threatened to kill respondent.
“8. ' During the early part of , the year 1939, on one occasion while respondent was leaving his place of business he was physi- ■ cally attacked by Oliver Esnault, Jr., and another, and respondent was compelled to defend himself with a walking stick or cane which he was then carrying because of an" injury he had sustained when he was kicked by a horse, and he. was compelled on that occasion to call for help and it was. only when help arrived that Oliver Esnault, Jr. and the other individual who had-attacked respondent, fled.
“9. The night said Oliver Esnault, Jr., and another attacked respondent as above alleged, when they fled the said Oliver Esnault, Jr., called out that he would be back.
“10. Approximately two weeks before July 21, 1949, Oliver Esnault, Jr." sent word to respondent that he, said Esnault, was going to kill respondent if it was the last thing he did.
“11. Shortly before the shooting the night of approximately July 21,1949, Oliver Esnault, Jr. called out and shouted on more than one occasion that he was going to kill respondent before daylight the next morning, and on one or more occasions pointed to respondent and said, in substance, that he was going to kill respondent before day, and at the same time said Oliver Esnault, Jr. used very obscene and filthy language in referring to respondent, using words so vulgar that respondent prefers not to mention them in this pleading.
“12. Fearing for -his life,- in view of the many threats made by Oliver Esnault, Jr., and in view of the fact that the said Esnault had previously attacked' him, and had sent word that he was' going to kill him, respondent in self-defense shot Oliver Es-nault, Jr.
“13. The said Oliver Esnault, Jr. charged out of the door'of a'nearby place of business, advancing in’ an aggressive manner on respondent, with his right hand behind him and in such a position that respondent feared and believed that Oliver Esnault, Jr. was reaching for a gun or pistol or some type of weapon with which to attempt to kill respondent, and because ■he was then and there in fear of his life or great bodily harm, acting in self-defense, respondent shot Oliver Esnault, Jr.
“14. Respondent therefore alleges that the shooting was justified, and that he acted only because he was.in fear -for his life.
“15. Alternatively, by virtue of the facts above alleged, respondent ¿specially pleads that the shooting was provoked by the said Oliver Esnault, Jr. himself, by insults,, abuse, threats an.d other conduct calculated to arouse resentment and fear on the part of. respondent.
“■16. Respondent alleges that by virtue of the facts above alleged, Oliver Esnault, Jr. could "not have recovered'damages from-defendant had he lived, and therefore his alleged widow, whose rights are no greater than those which Oliver Esnault, Jr. would have had, had he lived cannot recover anything whatsoever from your respondent.”
The case was tried and the District Júdge rendered judgment in favor of the defendant, rejecting the claim of the plaintiff with reasons dictated immediately after the trial in open court as follows-:
“This suit arises from a killing in which the husband of'the plaintiff'was killed by the defendant in the neighborhood of the location of defendant’s place of business.
“The issue presented is, in my opinion, simply a question of fact' arid from all the testimony' of the- witnesses, -I have reached the conclusion that Mr. Richard, who, to the Court’s personal knowledge, is not a belligerent person, did what any reasonable *496 man would have done under the same circumstances and only unfortunately killed the deceased after having first been in an altercation with the deceased some two weeks prior to the date of the killing and after a very dangerous threat had been made by the deceased, who, according to some of the witnesses that testified in the case, was a man who, when drunk, gave vent to his violence. It was further shown on the night of the killing the deceased had been drinking. It is also significant that this matter was brought to the attention of the Grand Jury and that body of men saw fit to bring in a No True Bill.
“I, therefore, am of the opinion that the defendant’s actions were justified under the conditions, and for these reasons judgment is rendered and will be signe'd dismissing plaintiff’s suit at her cost.”
There is very little dispute with regard to the facts, although plaintiff does make the following statement with regard to the facts in its brief:
“ * * * At the outset, plaintiff would like to preclude substantially all argument concerning the facts of this case by simply stating that for the purposes of this appeal, she intends to make out her case primarily on a supposition of fact similar with the fact situation that defendant sought to prove on the trial of this case. The plaintiff’s purpose in so doing is to facilitate a careful analysis by this Court of the serious legal question raised, and the plaintiff does not waive but specifically reserves her rights under any evidence produced on her behalf.”
“Briefly stating then substantially the fact situation as sought to be proved by the defendant, we find this situation:”
After this statement, we find the facts set- forth in the plaintiff’s brief substantially as proven on the trial of the case and as contended by the defendant.
The testimony reveals that the defendant operated a saloon for colored patrons on the corner of Orange and South 13th Street in Baton Rouge, Louisiana, and had been operating a business at that same location for more than twenty years. First he had a market, then a grocery business, and 'in 1935 or 1936 he went into the saloon business there. There is no evidence of any disturbances at the defendant’s place other than those which involved petitioner’s husband. In all of these the deceased was clearly in the wrong. It is shown that prior to any ill feeling on the part of the deceased toward the defendant that he had worked for the defendant, and the first time the deceased caused any trouble he was drunk after having spent all day in the defendant’s saloon, and after spending all his money he sought to buy a pint of whiskey on credit. The defendant refused to sell him any whiskey on credit and offered to send him home in a taxi, to which the deceased replied: “Hell, no, I don’t want no taxi; I want whiskey.” Richard told him that he did not sell whiskey on credit and wouldn’t even sell “my brother a pint of whiskey. on credit.” The deceased then said: “I ain’t your God Damned brother,” whereupon Richard in an effort to get away from the deceased started back of the bar, and the deceased then followed him and was stopped by the bar tender who finally got him to leave by lending him $3 to buy the- whiskey elsewhere.
Some time after this incident, the deceased came back to the defendant’s saloon and wanted to buy two bottles of beer for, himself and his friend, whereupon the defendant told him that he didn’t want him around his place of business and to go spend his money some place else, at another saloon, whereupon the deceased replied, “I reckon because I’m a poor son of a bitch that I can’t buy no beer here.” To this defendant made no answer. The deceased then left the saloon.
The next time, the deceased returned .one night while the defendant was putting his money in a safe. Defendant heard the night watchman pleading with some one to let him shut the door, and upon inquiry learned that it was the deceased, Oliver Esnault, Jr., whereupon the defendant stayed inside the building until he thought the deceased had -left. He then walked out the back door where his car was parked with the .intention of going home. At this time the defendant was walking with a stick due to having b.een kicked b.y a horse, *497 and when he got out to his car the deceased was leaning against the wall, and a friend, Andrew Jackson, the “black” one, so distinguished from a man who got shot known as the “light” one, was standing approximately six feet from the deceased in the driveway, and as the defendant prepared to get in his car the deceased used some vile language in asking the defendant if he thought he could back the car out with him standing there, and the deceased then immediately attacked the defendant and grabbed the stick while his friend, Andrew Jackson, caught the defendant from behind and back of the neck, whereupon the defendant by hollering attracted the.attention of his night watchman, Baba Wethers, who was also a cripple, 62 years of age and who had been working for the defendant intermittently for nine or ten years. When the deceased.and Jackson refused to cease the attack upon the defendant, this night watchman got a pistol and shot over their heads, whereupon they turned the defendant loose and deceased went to his car and told Jackson, “Come on, Buddy, let’s go,” and when they had gotten in the car the deceased said “We will be back.”
The testimony of the night watchman, with regard to this incident is that the deceased and Jackson came up to the back door and one of them knocked on the door and when he opened the door and saw them he told them that the saloon was closed, and he attempted to shut the door, whereupon the deceased put his foot in the door and, as always, using vile language, refused to allow him, to. shut the door. He finally got the door shut and at the time the defendant left the building by the back door to go to his .car and home the night watchman thought, also, that the deceased and Jackson had left.
A. short while after the deceased and Jackson had left in their car the defendant got in his car and started home, and while .on • his regular route he noticed a car parked cross ways of the street, and while he did not know and could not swear, he believed that it was the deceased and his friend lying in wait for him, .and he turned, off of, his regular route in order to avoid any: me.eting.
After the above described incident and attack by the deceased upon the defendant, the light Andrew Jackson came to the defendant’s saloon and told the defendant that he had been up in Dixie with the deceased the Saturday night before and that the deceased was drunk and had gotten in trouble up there and that during the evening he had told the light Andrew that he was going to kill the defendant if it was the last thing he did, and Jackson also added, “but I can tell you one thing — when Oliver comes back drunk — he don’t hardly come back unless he is drunk — a stone wall ain’t going to keep him from you.” All of the above happened within four to six weeks prior to the killing of the deceased on July 21, 1949.
In addition to the above facts it is proven that the deceased when drinking was of a violent nature.
On the night that deceased met his death, he, together with .four other colored men, after visiting at least two other bars that evening came to Amos Cryer’s B & B cafe and bar together in a car which the deceased had borrowed. They had started drinking immediately after leaving their work at 6 o’clock and arrived at Amos Cryer’s bar some time after 9 o’clock p. m., and although all of these friends with the deceased on that night testified that the deceased was not drunk and they did not hear him threaten the defendant, the preponderance of the evidence is entirely to the contrary and there is no doubt that the deceased not only was drunk but that he threatened in very vile terms the life of the defendant twice during that night before the actual shooting.
Amos Cryer’s cafe was separated from the defendant’s saloon 'by Orange Street, both Amos Cryer’s cafe and the defendant’s saloon faced and fronted on South 13th Street, and the intersection of Orange and South 13th Streets, therefore, was between the defendant’s saloon and that of Amos Cryer.
The deceased and his four friends were in Amos Cryer’s place just across Orange Street from one to two hours. One of the friends who was with..the deceased on that night was dark Andrew Jackson, and it is *498 shown that during the time they were at Amos Cryer’s saloon that dark Andrew made three trips in and through the defendant’s saloon for no apparent reason, or at least the reason which he gave was untrue, which leads us to believe that he was attempting to keep up with the defendant’s movements and whereabouts for his friend, the deceased. The testimony of these friends is of very little value to plaintiff and not impressive.
Behind the defendant’s saloon there was a toilet with a fence around it, and on this night Wethers was just inside this fence and the defendant came out of his building into the space between- the back of the building and the toilet itself. Wethers and the defendant heard the deceased, who was standing on the side walk in front of Amos Cryer’s B & B cafe and saloon, point his finger at defendant and say: “There is a-- — — I am going to kill before the-moon rises before day in the morning.” (Language omitted too vile to print). • The defendant did not answer the deceased, and Wethers, the night watchman, asked the defendant to go back into his saloon which he did. The defendant remained in his saloon for awhile and testified “I was scared; I didn’t know what to do, because I knew when he was drunk he was hell, and he walked around and he quieted down. I could hear him outside cursing and raising sand. He quieted down and I walked to the corner to see whether he was gone, hoping he was gone.” The defendant walked out the front door of his saloon to the corner of Orange and South 13th Street and the deceased was. still on the sidewalk, and just as soon as he saw the defendant “he was more madder that time than he was the first time.” The deceased waived his right hand and hollered: “That is that white-I’m going to kill before the-sun rises in the-morning.” At this time, the deceased was standing by his car in front of Amos Cryer’s B & B cafe, presumably with the four friends who had come there with him. The defendant did not answer the deceased but turned and walked back in the saloon, and walked back of the bar and picked up a shot gun and walked out the front door to the corner of Orange and Thirteenth Streets. When he got to the corner he stopped and hollered, “Where’s that son of a bitch that is going to kill Mr. Richard -before the sun rises.” There were four or five colored men standing by the car who threw up their hands and told him that they hadn’t said that about him and that that was their first time out there, to which the defendant replied: “Go ahead, boys, I wouldn’t hurt a strand of hair in your head,” and the defendant then stepped in the street a little further and hollered again the same thing, and again he hollered. It is the defendant’s testimony that after he had hollered the third time, the deceased lunged into the door on his way out toward him, and when he did he pulled the trigger without putting the gun to his shoulder. It is his testimony that he could not see the deceased’s hands and did not know at the time whether he had a weapon or not. The deceased fell back in the cafe wounded and died the next day at approximately 11 or 12 o’clock a. m.
The defendant also testified that he knew that the deceased was an expert shot, for when he was working for him on the farm prior to any ill feeling the deceased had toward the defendant that the deceased had brought his pistol to the farm and demonstrated his ability. The plaintiff doubts this testimony, however, there is nothing to disprove the fact, other than the fact that defendant, in order to bolster his case, might fabricate the' testimony. However, there should'be some fact upon which to presume that the defendant was perjuring himself, and we find none in the record. Under cross examination the defendant testified:
“Q. Did you think in order to save your life that it was necessary to go out and look Oliver Esnault up ? A. I did. I wasn’t going to sit there until he came in and killed me. I have got four doors to that saloon, three doors in the back and one in the front, and I know what he does when he is drunk,' and I was scared of him. That is the whole truth of it.
“Q. You stated that you went out and said, ‘Where is that son of a bitch that is *499 going to kill Mr. Richards before the sun rises?’ A. Yes.
“Q. How many times did you holler that? A. About three or four times. I hollered loud, too. When a man is scared he hollers loud.
“Q. Oliver wasn’t out there when you first came out with the gun? A. No, sir. He wasn’t out where I left him when I went to get the gun.
“Q. What did you plan to do- with the gun ? Did you intend to scare him or shoot him? A. If he had come out there and talked to me or come out like he ought to, I would not have shot him. I didn’t want to shoot nobody. I make my living off colored people. Why would I shoot a man just to be shooting?
“Q. You say after you shot the man you shifted the gun to your shoulder and got ready for' him to come back? A. Yes, because I didn’t know whether I had hit him.
“Q. Why didn’t you retreat and go in your place? A. If I hadn’t hit him, let him go back there and kill me ?
“Q. Your position is that it was necessary for you to go out and kill him? A. He said he was going to kill me, didn’t he ? I didn’t threaten his life.
“Q. Your position was that it was necessary for you to go kill him in order to defend yourself ? Isn’t that right ? A. I thought he was going to kill me.
“Q. And because you thought he was going to kill you, you thought it was necessary to kill him first? A. I might just as well be dead as to be scared to death. Do you want the truth? I am sitting in a building with lights and four doors to it and wait until a man who said he was going to kill me before the sun rises — what would you do? Would you sit and wait for him to kill you?”
The record further reveals that the deceased was told by one of his friends, Melvin Times, that the defendant was out front with a gun, and just a moment before he was shot the deceased was apparently arguing with some one in the building who was trying to keep him from going outside. We have the testimony of the witness Jesse Redmon as to this fact and also with regard to the incident just prior to and at the time of the shooting, as follows:
“Q. When you came back out of Orange, when you first saw Mr. Richard by the fire plug, what was the first thing you heard anybody say at that time? A. Mr. Richard said, ‘Who was that over there wants to kill Mr. Richard?’ And three or four other boys held their hands up and said ‘It wasn’t us, Mr. Richard.’ He said, ‘Come away from over there, then,’ and by that time he repeated again — I was pretty close to him then — he said, ‘Who is that over there wants to kill Mr. Richard ?’ and these boys ran on up Thirteenth Street, and that time Oliver came to the door and he lunged against the screen with his left shoulder, with his right hand down beside him, and at that time Mr. Richard shot when he started out the door.
“Q. Before the shot was fired, what, if anything, did you hear Oliver say from inside the cafe? A. He said it looked like somebody was trying to' get him not to gO' out the door. That is when he. repeated he was going to get that so and so before day in the morning.
“Q. Was Mr. Richard standing out in the street at that time ? A. Yes, sir.”
The testimony as to how or in what manner the deceased came out the door of Amos Cryer’s saloon at the time he was shot was described by Redmon by saying that deceased “lunged” at the door, while dark Andrew Jackson, one of the friends of deceased, stated that he “shoved” the door open, and defendant said the deceased “struck” the door. Counsel for plaintiff contends that the opening of the do,or by the deceased was not a spontaneous, sudden act, but, in fact, consisted of a delay of some perceptible differences of time well sufficient to not cause a surprise to those observing him, such as Oscar Richard, as well as Redmon. They base this contention upon the following testimony by Redmon:
, “Q. So that when he lunged at the door his left side was pointing out toward Mr. Richard? Is that right? A. Yes, sir.
*500 “Q. While he was in that position, Mr. Richard shot him? Is that correct? A. The door opened. That minute Mr. Richard didn’t shoot him, hut when he started out the door, that is when Mr. Richard shot him.”
* * * * * *
“Q. And Mr. Richard shot him in the left side? A. I don’t know what side he shot him; I didn’t stay there to see.” This witness’ testimony on this point is not complete as quoted, that is, doesn’t give his full testimony so that it can be correctly interpreted. In order to evaluate his testimony on this point it is necessary to quote more of his testimony which includes that quoted by the plaintiff, and his testimony is as follows:
“Q. Now, you said that he lunged with ■his left shoulder' at the door? A. Yes, sir.
“Q. And his right hand was down by his side? A. Yes, sir.
“Q. Where was his right hand at the time? A.- May I rise?
“Q. Rise and demonstrate. A. He lunged at the door like this (illustrating), like somebody behind him was talking to him, and he lunged at the door with his left shoulder, with his right hand down by his side. When he attempted to come out of the door, Mr. Richard shot him.
“Q. So that when he lunged at the door his left side was pointing out toward Mr. Richard? Is that right? A. Yes, sir.
“Q. While he was in that position, Mr. Richard shot him? Is that correct? A. The door opened. That minute Mr. Richard didn’t shoot him, but when he started out the door, that is when Mr. Richard shot him.
“Q. But his left side was pointing to Mr. Richard at the time he was shot? A. Yes, sir. That is what he opened the door with — his left side.
“Q. .And. Mr. Richard shot him in the left side? A. . I. don’t know what side he shot him; I didn’t stay there to see.”
It is our opinion that the plaintiffs are riot correct in their appreciation of the testimony to the effect that the deceased came to the door, stood and then opened the door. This record shows that Melvin Times went into this saloon after Richard came out with the gun and after Richard had talked to' the four of them, and told the deceased that Richard was out in front with the gun. Whereupon, some one in the saloon tried to prevent deceased from going out and he still at that time repeated his threat and came lunging out the screen door.
It is true that the doctor testified that the position of the'gun at the time the buckshot struck the deceased must have been slightly to the rear and right of the deceased. This is easily explained. As he lunged into the door with' his left shoulder and hand, his body was at an angle and as he came out the door he exposed his right side to the defendant. He was not shot directly in the back but was shot slightly to the rear of a line from the middle of his armpit down to his hip bone. There is absolutely no testimony to show that the deceased was attempting to retreat or go back in the door at the moment he was shot. Plaintiff contends under these facts and a line of decisions of the courts of this state that the defendant is liable.
Counsel for plaintiff in their brief proceed on the erroneous fact that in the present case there was only a mere verbal threat to kill unaccompanied by any overt act. Based upon this erroneous statement of the facts, they argue:
“Louisiana cases may be divided into two broad classes. The first class of cases, in which recovery is invariably denied, sets out a rule that if the plaintiff provoked the difficulty, or ‘brought it on’ or was ‘at'fault’ even though his fault consisted simply of abusive language alone, recovery is denied because plaintiff was the ‘aggressor.’ This line of cases does not consider the sufficiency of the provocation, nor the reasonableness of the force brought to bear by the defendant.”
“The second line of Louisiana cases upon which plaintiff relies,' sets forth the rule that in order to justify a brutal assault and battery it is necessáry that the defendant show an overt act of hostility. This class of cases tests the sufficiency of any acts by the plaintiff to determine' whether they con *501 stitute a provocation. These cases further look to the act of the defendant to determine if his violence was commensurate with the degree of provocation presented. Plaintiff intends to demonstrate to this 'Court’s satisfaction that the Louisiana law applicable to the instant case requires the defendant to prove an overt act of hostility on the part of the deceased, which he has not done.”
Counsel for plaintiff ■ recognizes that general class of cases denying recovery on the ground that one who provokes a difficulty with another cannot recover damages for injuries inflicted upon him as the result thereof, even though the conduct of the one who- inflicted the injuries was not justified in law. Welch v. Van Valkenburgh, La.App.2d Cir., 189 So. 297; Oakes v. H. Weil Baking Co., 174 La. 770, 141 So. 456; Lide v. Parker, 6 La.App. 648; Vernon v. Bankston, 28 La.Ann. 710; Johns v. Brinker, 30 La.Ann. 241; Bankston v. Folks, 38 La.Ann. 267; Miller v. Meche, 111 La. 143, 35 So. 491; Massett v. Keff, 116 La. 1107, 41 So. 330; Bonneval v. American Coffee Co., 127 La. 57, 53 So. 426; Fontenelle v. Waguespack, 150 La. 316, 90 So. 662; Finkelstein v. Naihaus, La.App., 151 So. 686; Landry v. Himel, La. App., 176 So. 627; Manuel v. Ardoin, La.App., 16 So.2d 72; Hartfield v. Thomas, La.App., 45 So.2d 216; Smith v. Clemmons, Sheriff, La.App., 48 So.2d 813.
Counsel for plaintiff contends that there is a second line of Louisiana cases upon which he relies that sets forth the rule that in order to justify a brutal assault and battery it is necessary that the defendant show an overt act of hostility; that this class of cases tests the sufficiency “of any acts by the plaintiff to determine whether they constituted a provocation;” that’ these cases further look to the act of the defendant to determine whether his violence was commensurate with the degree of provocation presented. Plaintiff cites Britt v. Merritt, La.App., 45 So.2d 902, 906 and quotes therefrom. The -holding in this case specifically recognizes the -doctrine that one who provokes a difficulty with another cannot recover damages for injuries' inflicted upon him as a result thereof even though the conduct of one who inflicted the injuries is not justified in law. Citing many of the cases, supra, the court specifically held in that case that “The clear preponderance of the evidence exonerates the deceased of t-he charge of being the aggressor.”
Counsel for plaintiff then cites Oakes v. H. Weil Baking Co., 74 La. 770, 141 So. 456, and states: “Here plaintiff had been fired and returned to- the place of his former employment to get tools he had left there. The owner came in and plaintiff cursed and abused him. Defendant grabbed plaintiff and carried him out of the place of business and then kicked him out of the building. The Court held defendant’s acts were justified in removing plaintiff from the premises because of the plaintiff’s abusive language but that defendant was liable for the ‘parting kick.’ The use of this force was not justified under the circumstances and the court not only considered the reasonableness of the force but decided that it was not justified by a consideration of the sufficiency of the provocation.”
Regardless of whether the Court considered the reasonableness of the force and decided that it was not justified by a consideration of the sufficiency of the provocation, the court also stated: “The doctrine is well established in this state that one who provokes a difficulty with another cannot recover damages for injuries inflicted upon him as a result thereof, even though the conduct of the one who inflicts the injuries was not justified in law. Lide v. Parker, 6 La.App. 648; Vernon v. Bankston, 28 La.Ann. 710; Johns v. Brinker, 30 La.Ann. 241; Bankston v. Folks, 38 La.Ann. 267; Miller v. Meche, 111 La. 143, 35 So. 491; Massett v. Keff, 116 La. 1107, 41 So. 330; Bonneval v. American Coffee Co., 127 La. 57, 53 So. 426; Fontenelle v. Waguespack, 150 La. 316, 90 So. 662.”
Counsel cites McVay v. Ellis, 148 La. 247, 86 So. 783, 784, in which the Court declared : “The obj ectionable epithet was not sufficient cause or provocation for the assault and battery administered by defendant upon plaintiff”.-
*502 Also cited is the case of Randall v. Ridgley, La.App., 185 So. 632, in .which case the Court stated:
“ * * * It is difficult to understand how Ridgley could have shot at the ground and hit Randall, but we do not regard the matter as important, for, in either event, the question is whether the -situation warranted the use of firearms. * * *
sjs íJí * % ?{c #
“It must be conceded that Ridgley was justified in ejecting Randall from his barroom and that he could justifiably use whatever force might be necessary to accomplish this result since Randall was creating a disturbance and annoying one of his patrons. But Randall and his companions were out of the barroom and in the parking lot adjacent to Ridgley’s place of business when the shooting occurred. They were, no doubt, in a resentful mood and were quite likely denouncing Ridgley by the use of opprobrious epithets, but no blows were struck, nor was there anything to indicate that Ridgley was in any danger of bodily harm. The use of firearms in this situation was unwarranted.”
He also cites Beaucoudray v. Hirsch, La.App., 49 So.2d 770, 772. Plaintiff quotes the court in that case as follows:
“It is argued on behalf of Hirsch that the deliberately reckless manner in which Beaucoudray drove his automobile was sufficient to cause any reasonable man to lose his temper, and that the court should take this into consideration in passing on the case.
“That argument is fully answered by the following passage appearing in 6 C.J.S., Assault and Battery, § 17, page 807: ‘ * * no provocative acts, conduct, former insults, threats, or words, if unaccompanied by any overt act of hostility, will justify an assault, no matter how offensive, or exasperating, nor how much they may be calculated to excite or irritate.’ ”
The Court also said in this case: “Hirsch claims that Beaucoudray struck him, which the latter denies. Whether Beaucoudray struck Hirsch and caused damage to his clothing during the scuffle, is relatively unimportant. Even if Beaucoudray did strike Hirsch after the men grappled, we believe he was within his rights in doing so, as it cannot be said that a man should meekly take a thrashing from an aggressor, and not endeavor to repel him.” (Emphasis added.)
The Court, we see, very definitely found that the defendant was the aggressor and not the plaintiff.
Should we accept plaintiff’s contention that there must be a hostile demonstration or an overt act or that we must inquire into the reasonableness of the defendant’s action, applying these tests in light of the facts which we have found as «proven in this case the deceased was the aggressor throughout; he never retreated from the fray, but, on the contrary, the defendant who had been cursed, abused, threatened and attacked physically prior to the night of the shooting, and who had always retreated, and on the night of the shooting was spied upon by a friend of the deceased and threatened twice by the deceased over a period of some two hours, had every provocation and cause to prepare himself in defense of his life. This he did after the second threat, and after listening to the raving talk and threats of the deceased after the defendant had retreated to a saloon, by getting a shot gun and going out into the street to avoid possible ambush. The defendant did not go into Amos Cryer’s Saloon to attack or kill the deceased but stayed out in the street under the light. We then find a friend of the deceased going into the saloon and telling him that Richard was on the outside with a gun. What happens next? The deceased repeats his threats in the saloon which were heard by Richard as well as the disinterested witness, Redmon, and although some one in the saloon attempted to keep him from going out he lunged out the door, well-knowing that Richard was standing out in the street with a gun. It is true that no gun was found on the deceased but Richard had the right to act upon the appearances, and he was justified in believing that he was about to suffer great bodily harm.
The only time that the defendant might even be considered in anywise the aggressor was when he went out in the street and asked what so and so didn’t like Mr. Rich *503 ard and was going to kill him befóte sunrise. The provocation shown in this case was sufficient for the defendant to invite an end to the affair. It was not at all necessary for the deceased to accept the invitation even if we consider it as such. He should have done as the defendant had done’ on many occasions, stayed where he was or retreated. Deceased knew that Richard was outside with a shot gun. He was in a place of safety. Why did he not remain there? No, he made an attempt to carry out his threat.
In this case there was an overt act as well as direct threats and a communicated threat by a third party as well as a prior physical attack.
While we are of the opinion that we should strictly adhere to the old line of jurisprudence until it is changed, as shown by the cases cited, supra, and which hold that one who is the aggressor and provokes a difficulty with another cannot recover damages for injuries inflicted upon him as a result thereof, even though the conduct of the one who inflicts the injury is not justified in law, we believe the facts in this case can meet the test which counsel for the plaintiff contends should be applied, and as was applied in Randall v. Ridgley, supra. In that case there was nothing “to indicate that Ridgley was in any danger of bodily harm,” while in the present case there is no doubt but that the defendant was in danger of great bodily harm.
Judgment affirmed.