SHALMON STENNIS      *      NO. 2023-CA-0482

VERSUS      *

     COURT OF APPEAL

LOWE'S HOME CENTERS,      *
LLC D/B/A LOWE'S AND RD S.      FOURTH CIRCUIT
MORRIS AND ABC      *
INSURANCE COMPANY      STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2020-10769, DIVISION "G"
Honorable Sheryl Howard, Judge
* * * * * *
**Judge Daniel L. Dysart**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Sandra Cabrina Jenkins, Judge
Karen K. Herman)

**JENKINS, J., CONCURS IN THE RESULT.**

Artis G. Ulmer, III
ATTORNEY AT LAW
26906 Autumn Timbers Lane
Cypress, TX 77433

Robert McKnight
ATTORNEY AT LAW
3027 Burdette Street
New Orleans, LA 70125

     COUNSEL FOR PLAINTIFF/APPELLANT

Paul J. Politz
Caroline M. Murley
TAYLOR, WELLONS, POLITZ & DUHE, APLC
1515 Poydras Street
Suite 1900
New Orleans, LA 70112

     COUNSEL FOR DEFENDANT/APPELLEE LOWE'S HOME CENTERS,
     LLC

Lyon H. Garrison
Darrin L. Forte
GARRISON YOUNT FORTE & MULCAHY, L.L.C.
909 Poydras Street
Suite 1800
New Orleans, LA 70112--4053


COUNSEL FOR DEFENDANT/APPELLEE R.D. MORRIS, JR.


**AFFIRMED**
**APRIL 2, 2024**

DLD
KKH

This case stems from an altercation at Lowe's Home Center on Elysian Fields Boulevard in New Orleans on November 11, 2020. The altercation involved plaintiff, Shalmon Stennis, who was a customer at the store, and defendant, R.D. Morris, a Lowe's Home Center employee.

Plaintiff filed suit for damages against Lowe's Home Center and Mr. Morris for injuries sustained in this incident. For ease of reference, we will refer to Lowe's Home Center as "Lowe's" and defendant Morris as "defendant".

Following a four-day jury trial, the trial court rendered judgment in accordance with the jury's findings. Plaintiff's claim against Lowe's was dismissed, and judgment was entered in favor of plaintiff and against defendant in the amount of $31,536.74. The jury allocated 65% fault to defendant and 35% fault to plaintiff, and found the total damages sustained by plaintiff to be $48,518.06. The amount awarded to plaintiff by the trial court was reduced by the 35% fault allocated to him.

The parties involved in the incident at issue offered conflicting versions of events leading to the physical aspect of the altercation. The Lowe's store was equipped with surveillance video that captured the incident at issue. The video

1

was admitted into evidence at trial and was viewed by the jury; however, the video does not include audio. Plaintiff's current wife, Dr. Lauren Stennis, is the ex-wife of defendant. Dr. Stennis and defendant share custody of their three children.

Plaintiff testified that he had just purchased the items he needed at Lowe's when defendant, whom he claims he did not recognize, approached him and started cursing at him. According to plaintiff, defendant had previously walked past him in the store and "made an outburst" and cursed at him.

Plaintiff alleged that as he continued toward the exit with his purchases, defendant told him that he would kill him. Plaintiff could see that defendant had an object in his hand. At that point, defendant pushed plaintiff and defendant responded by striking plaintiff with a pair of bolt cutters. Plaintiff claimed he still had no idea who was attacking him because defendant was wearing a baseball cap pulled down to the top of his eyes and was also wearing a mask as required at that time due to Covid-19 precautions. He claimed that all he could see was defendant's eyes.

Plaintiff testified that he did not say anything to defendant before being attacked. He claimed that he did not realize defendant's identity until after the fight when defendant took off his mask. Plaintiff testified that he had never met defendant before the incident. He said he recognized defendant when he removed his mask because he had seen photos of him.

Plaintiff claimed that he was on the phone with his mother throughout the entire incident. He testified on direct examination that he told his mother he was going to his vehicle to get his gun because if defendant pursued him, he was going to defend himself. On cross-examination, he acknowledged threatening to get his gun out of his truck, but contends he only made this threat after the fight had

concluded.  He never got his gun and never went back inside the store after the altercation.  Plaintiff denied ever being asked to leave the store by defendant prior to the altercation.

Defendant offered a very different version of events.  He testified that he was filling an online order for a Lowe's customer when he passed plaintiff who started cursing at him and insulting him.  He acknowledged cursing back.  The verbal exchange escalated, with plaintiff allegedly following defendant and threatening to shoot him saying, "I'll shoot you right here, right now.  We can finish this off today."  Defendant claimed he then turned around to face plaintiff "because there was explicits [sic] being said and I'm being talked about being shot in my store."  He said that plaintiff knew who he was.

Defendant said he told plaintiff to leave the store.  He said he did so because his life had been threatened, and he wanted to protect himself and others in the store.  Defendant testified that his position as a store manager gave him the authority to tell plaintiff to leave the store.  After plaintiff refused to leave the store, defendant testified that he believed he had no choice but to respond physically to plaintiff because of the threats of gun violence.

In support of his claim that plaintiff knew who he was on the day of the incident, defendant said that three or four years prior to this incident at Lowe's, he had a verbal altercation with plaintiff in the parking lot of a lawyer's office. Defendant and his then-wife had just attended a meeting regarding their divorce. When defendant exited the building, he saw plaintiff waiting in his vehicle. Defendant claimed that plaintiff said to him "you walk up on this car, I'm going to shoot you through this door."  Defendant retreated and the encounter ended.

Both liability and damages are disputed issues in this case. While it is undisputed that plaintiff was injured in the fight, the extent of those injuries is disputed. Another disputed issue is the party or parties responsible for those injuries. Plaintiff claims that he was free from fault and that Lowe's is liable for the actions of its employee. Defendant and Lowe's claim that plaintiff shares some fault for this incident. Defendant also claims that he should not have personal liability in this matter because he was acting within the course and scope of his employment with Lowe's when he fought with plaintiff.

Following trial, the jury responded to interrogatories finding that:

(1) Plaintiff proved by a preponderance of the evidence that defendant committed a battery on him on November 11, 2020;

(2) Defendant did not prove by a preponderance of the evidence that he was acting in self-defense or in defense of others on November 11, 2020;

(3) The actions of plaintiff contributed to the altercation and his own injuries, with plaintiff assigned 35% of the fault and defendant assigned 65% of the fault;

(4) Neither plaintiff nor defendant proved by a preponderance of the evidence that the actions of defendant were primarily employment rooted or reasonably incidental to his job duties as a Lowe's employee;

(5) Plaintiff proved by a preponderance of the evidence that he sustained injuries as a result of the incident on November 11, 2020;

(6) The appropriate amounts to compensate plaintiff for the damages he proved are $20,000 for past, present and future pain and suffering, $20,000 for past, present and future mental anguish, and $8,518.06 for past medical expenses. The jury found no amount due to plaintiff for loss of enjoyment of life.

The trial court accepted the jury's verdict and rendered judgment in favor of plaintiff and against defendant in the total amount of $31,536.74 in accordance with the jury's findings. Judgment was also entered in favor of Lowe's and against

4

plaintiff, specifying that Lowe's owed nothing in this matter. The trial court did not issue any additional reasons for judgment. Plaintiff moved for judgment notwithstanding the verdict. The motion was denied, and this timely devolutive appeal by plaintiff followed.

On appeal, plaintiff/appellant sets forth five assignments of error:

(1) The jury erred by finding the battery committed by defendant was not primarily rooted or reasonably incidental to his employment with Lowe's;

(2) The jury erred by finding him to be 35% at fault;

(3) The jury abused its discretion by awarding only $20,000 for his past, present and future pain and suffering;

(4) The jury abused its discretion by awarding only $20,000 for his past, present and future mental anguish; and

(5) The jury abused its discretion by not awarding damages for his loss of enjoyment of life.

Both plaintiff and defendant argue on appeal that the jury erred in finding that the actions of defendant in the incident at issue were not primarily rooted or reasonably incidental to his employment with Lowe's.[1] Based on this jury finding, the trial court found no vicarious liability on the part of Lowe's for the actions of its employee.

"A trial court's determination that a particular act is within the course and scope of employment for purposes of vicarious liability is a factual finding governed by the manifest error rule." *Robinson v. Ky Quang Nguyen*, 2016-0258, p. 6 (La. App. 4 Cir. 9/21/16), 201 So. 3d 922, 926, citing *Ermert v. Hartford*

---

[1] Defendant did not appeal the judgment or answer the appeal, so he cannot seek to have the judgment modified, revised or reversed. La. C.C.P. art. 2133. However, the argument regarding Lowe's liability for defendant's actions is properly before this Court by way of plaintiff's appeal.

*Insurance Co.*, 559 So.2d 467, 478 (La.1990). This standard of review "precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety." *Hall v. Folger Coffee Co.*, 2003-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98, citing *Cenac v. Public Access Water Rights Ass'n*, 2002-2660, p. 9 (La.6/27/03), 851 So.2d 1006,1023. "[A] reviewing court may not merely decide if it would have found the facts of the case differently." *Id.* "Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La.1993).

Louisiana Civil Code article 2320 states that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." The Louisiana Supreme Court has set forth the following factors to consider in determining whether an employer is vicariously liable for the intentional act of its employee:

> (1) whether the tortious act was primarily employment rooted;

> (2) whether the violence was reasonably incidental to the performance of the employee's duties;

> (3) whether the act occurred on the employer's premises; and

> (4) whether it occurred during the hours of employment.

*Baumeister v. Plunkett*, 95-2270, p. 4 (La. 5/21/96), 673 So.2d 994, 996-997, citing *Lebrane v. Lewis*, 292 So.2d 216, 218 (La. 1974). The tortious conduct of the employee must be so closely connected to his employment duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with

conduct motivated by purely personal considerations entirely extraneous to the employer's interests. *Id.*

It is undisputed that defendant/employee's actions at issue occurred on the employer's premises during his hours of employment. The disputed issue here is whether defendant's actions were primarily employment rooted or reasonably incidental to the performance of his duties. Defendant testified that because plaintiff had allegedly threatened to shoot him in the store and refused to leave the store when initially ordered to do so, he had to respond the way he did to protect himself and other employees and customers in the store. However, his testimony also revealed that he did not alert anyone connected to the store that there had been a threat of gun violence in the store until after the incident had concluded and the plaintiff had left the store. Although defendant admitted that there was pre-existing animosity between him and plaintiff based on the aforementioned issues in their personal lives, he nonetheless claimed that his actions against plaintiff were motivated solely by his concern for the safety and well-being of not only himself, but also of customers and co-workers in the store.

Joseph Banks, the manager of this Lowe's store at the time of the incident, testified that defendant's actions violated store policies: (1) prohibiting employees from retaliating against customers, (2) prohibiting violence towards customers, and (3) requiring employees to deal fairly and professionally with customers. Mr. Banks said that defendant never told him that there was a threat of gun violence that precipitated the fight. He testified that he did not know what started the fight, and was summoned from his office that day only after the fight had concluded. He said that this Lowe's store has paid security outside the store, and if defendant had

7

concerns about the safety of customers, he could have summoned security but he did not. Defendant's employment with Lowe's was terminated after this incident.

The issue of Lowe's vicarious liability for defendant's actions involved credibility determinations by the jury. As stated above, the jury found that the actions of defendant were not primarily rooted or reasonably incidental to his job duties as an employee of Lowe's. Defendant argues that even if the primary motivation for the fight was personal in nature, which he denies, Lowe's can still be held vicariously liable because his conduct was also still reasonably related to his employment duties. The jury evaluated the testimony relating to this issue and rejected the claim that defendant's actions had any connection to his job duties. We conclude that this was a reasonable credibility determination, and find no merit in the argument that the jury erred in finding no liability on Lowe's part for defendant's actions.

In the next assignment of error, plaintiff argues that the jury erred in finding him 35% at fault for the altercation and his resulting injuries. The trial court accepted the jury's finding that both plaintiff and defendant were at fault in this incident. Plaintiff was assigned 35% of the fault, and defendant was assigned 65% of the fault.

Louisiana Civil Code article 2323 sets forth the following principles regarding comparative fault:

> A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of

8

the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.

"Whether comparative fault applies in a given case is a factual determination governed by the manifest error standard of review; hence, '[o]nly if the apportionment of fault is found to be clearly wrong can an appellate court adjust percentages.' " *Ambrose v. McLaney*, 2006-1181, p. 11 (La. App. 4 Cir. 5/16/07), 959 So. 2d 529, 536, citing *Maldonado v. Louisiana Superdome Comm'n*, 95-2490, p. 10 (La. App. 4 Cir. 1/22/97), 687 So.2d 1087, 1093; *Clement v. Frey*, 95-1119, pp. 7-8 (La. 1/16/96), 666 So.2d 607, 610-11.

Although there was conflicting testimony by the parties, the in-store video shows that the parties were two willing combatants. The video clearly depicts plaintiff and defendant "squaring up" against each other, chest to chest, in each other's faces arguing violently and equally remonstrated before the affray commences. Despite plaintiff's declarations to the contrary, it appears the parties were well familiar with each other during this exchange. It is at this point that plaintiff shoves defendant and in return defendant retaliates by striking plaintiff with the bolt cutter.

Both parties committed intentional torts as both were willing participants to the fight. Historically under our tort law, the combatants would have been deemed

9

consenting and therefore barred from recovery. Consent, as two boxers entering a ring, operated as a complete bar to recovery regardless of whether the measure of response was unreasonable and excessive. A classic illustration of the consent concept is in *Haydel v. Bullinger* 128 So.2d. 441 (La.App. 4 Cir. 1961). After his daughter's wedding reception, defendant William Stansbury and Edward Clancy, the stepfather of the bride, argued over payment for the cost of the reception. Wanting to speak to his ex-wife after the festivities ended, Stansbury and Bullinger, the brother of the groom, went to Edward Clancy's bar and upon entering were confronted by a number of Clancy's friends and patrons who began to punch and kick Stansbury. Bullinger retreated to his car, obtained a pistol and returned to the fray intending to rescue Stansbury from his assailants. Upon reentering, Bullinger was confronted by plaintiff Haydel who attempted to attack him after an exchange of words. Bullinger struck Haydel with the pistol and it discharged shooting Haydel in the mouth. This Court ruled:

> Even where the force used is unjustified from the standpoint of the criminal law, civil liability does not necessarily follow. *See Robertson v. Palmer*, La.App., 74 So.2d 408, 410; *Britt v. Merritt*, La.App., 45 So.2d 902, 905. This rule is based on the legal principle that one who is himself at fault cannot recover damages for a wrong resulting from such fault although the party inflicting the injury was not himself legally justified. *Brown v. Lambert*, La.App., 71 So.2d 410; *Wade v. Gennaro*, La.App., 8 So.2d 561.

*Haydel v. Bullinger*, 128 So. 2d 441, 441-42 (La.App. 4 Cir. 1961).

However, since 1980, comparative fault is the measure. In *Landry v. Bellanger*, 2002-1443 (La. 5/20/03), 851 So. 2d 943, which also involved a physical altercation, our Supreme Court stated:

> "Louisiana employs a "pure" comparative fault system, whereby the fault of all persons causing or contributing to injury is to be compared. When it adopted the comparative fault system, Louisiana abolished the contributory negligence feature, which

10

> completely barred the recovery of injury victims because of their fault, our tort law formerly embraced prior to 1980. *See Dumas, supra,* 02–0563 at pp. 4–5, 828 So.2d at 532–33."

*Landry,* 2002-1443, p. 12, 851 So. 2d at 952-53.

Under the provisions of La. C.C. art. 2323B, comparative fault applies to any claim of damages for injury under any theory of liability, and therefore applies here. Here, the video reflects that plaintiff consented to a fight, but the response defendant used was excessive and not reasonable. *See Andrepont v. Naquin*, 345 So.2d 1216 (La.App. 1st Cir. 1977), citing *White v. Gill*, 309 So.2d 744 (La.App. 4th Cir. 1975); *Buchert v. Metropolitan Life Insurance Company*, 219 So.2d 584 (La.App. 4th Cir. 1969). Accordingly we find the jury did not commit manifest error when they assigned defendant a greater share of fault for this altercation.

Given the actions of each party, we find no error in the jury's determination that plaintiff was 35% at fault and defendant was 65% at fault.

The remaining assignments of error address the general damages awards. The trial court judgment accepted the jury's finding that plaintiff's damages were $20,000 for past, present and future pain and suffering, $20,000 for past, present and future mental anguish and $8,518.00 for past medical expenses. The jury made no award for loss of enjoyment of life. Plaintiff argues that the awards for pain and suffering and mental anguish were an abuse of discretion, inadequate and should be increased. He also argues that it was an abuse of discretion for the trial court to not award damages for loss of enjoyment of life.

The Louisiana Supreme Court recently set forth a new rule requiring the consideration of prior awards in determining whether there has been an abuse of discretion in an award of general damages.

Our jurisprudence has a long-standing general principle, most recently reiterated by this Court in *Jones v. Mkt. Basket Stores, Inc.*, 22-00841, p. 16 (La. 3/17/23), 359 So. 3d 452, 464 (citation omitted), that, in reviewing a general damage award, the "initial inquiry ... is whether the trier of fact abused its discretion in assessing the amount of damages." Thereafter, and only when a determination has been made that the "trier of fact has abused its 'much discretion,' " will a court "resort to prior awards ... and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion." *Id.*

We have carefully considered whether it remains a sound practice to allow consideration of prior awards only after finding an "abuse of discretion," or whether those awards are a relevant factor to be considered in determining whether there has been an abuse of discretion at the outset. There are no specific parameters by which an "abuse of discretion" is measured, nor a meaningful definition of this phrase. Such determinations are not subject to mathematical exactitude or scientific precision. Indeed, as this Court has recognized, "[t]he standard for appellate review for abuse of discretion in the award of general damages is difficult to express and is necessarily non-specific." *Cone v. Nat'l Emergency Servs., Inc.*, 99-0934, p. 8 (La. 10/29/99), 747 So. 2d 1085, 1089 (citing *Youn v. Mar. Overseas Corp.*, 623 So. 2d 1257, 1261 (La.1993)).

The inherently subjective nature of the abuse of discretion standard in the context of reviewing general damage awards compels that some measure of objectivity be incorporated into the determination of an award's reasonableness, so that there is some standard for comparison. We now hold that an appellate court must consider relevant prior general damage awards as guidance in determining whether a trier of fact's award is an abuse of discretion.

*Pete v. Boland Marine & Mfg. Co. LLC*, 23-00170, p. 2 (La. 10/20/23), ⸺ So.3d ⸺, ⸺, 2023 WL 6937381.

Plaintiff claims that he suffered a 50% loss of peripheral vision in his left eye as a result of the physical altercation. He also claims that he sustained injuries to his head, back, shoulder, wrist and hip, and that his injuries have caused him to suffer from headaches, including migraines.

On the issue of physical injuries allegedly sustained by plaintiff in the incident, his wife, Dr. Lauren Stennis, testified at trial that her husband told her in the Ochsner emergency room that day that he had diminished vision in his left eye.

She claimed that he had never complained of headaches or diminished vision prior to that day. She stated in the two years between the incident and trial, her husband suffered from chronic migraines.

Plaintiff testified that defendant hit him seven times in the head and body with a pair of bolt cutters. He said that as a result of this assault, he received head, back, shoulder, wrist and hip injuries, and began to have vision problems and migraine headaches.

The records from the emergency room where plaintiff was taken following the incident show that he presented with a head injury and received five staples to the top of his head due to lacerations. Some bruising was noted over his left clavicle without tenderness and he had full range of motion in his left shoulder. The CT scan of plaintiff's head taken that day revealed "no acute intracranial abnormalities in this motion limited exam" and "soft tissue edema/hematoma with possible superimposed laceration involving the posterior parietal soft tissues on the left."

Plaintiff testified that immediately after the altercation, his vision became blurry. However, the emergency room records show that when asked if he had any visual changes, he answered that he did not. At trial, plaintiff attempted to explain that answer by stating that he meant there had been no changes between the time that the blurriness started immediately following the incident and when he arrived at the emergency room. He admitted he had vision issues prior to the incident but claimed that his vision was worse after the incident. He said he was able to see out of the corner of his left eye before the altercation but not immediately after. He testified that his right eye was not affected.

The emergency room records also show that medical personnel conducted several assessments of plaintiff's eyes while he was treated there in the hours immediately after the incident. He testified that he did not recall those eye assessments. The discharge instructions from plaintiff's emergency room visit stated:

> You may have headache for the next few days
> You can take Tylenol and apply ice pack to the area
> Staples will need to be taken out in the next 10 days

While the discharge instructions from the emergency room visit show that plaintiff received staples for a scalp laceration and could have headaches associated with the same, they do not mention any eye injury or any instructions to seek further treatment for an eye injury.

Plaintiff testified that he began having migraine headaches after the incident, and sought treatment from a neurologist at Crescent City Headaches. He had an MRI and was prescribed pain medication but the medication was not effective. He stopped treatment with the neurologist even though he said his headaches continued. He said he now manages his headache pain with over-the-counter medications. The neurologist who treated plaintiff did not testify at trial.

Plaintiff described his shoulder pain from being hit with bolt cutters but said this pain did not last long. He said he also sustained injuries to his wrist, hip and back when he landed on the floor during the fight, and his soreness from those injuries lasted "maybe a month or two". The medical records show subjective complaints made by plaintiff about these injuries. He also went to physical therapy, which he said was helpful in alleviating his pain. The records show he went to physical therapy four times.

Dr. Jared Vincent was accepted by the trial court as an expert in the field of ophthalmology. Plaintiff first sought treatment from Dr. Vincent five days after the incident. Dr. Vincent testified that it was his opinion to a reasonable degree of medical certainty that the direct blow in the altercation at Lowe's caused an indirect traumatic optic neuropathy in which plaintiff's left optic nerve was damaged. His diagnosis was that plaintiff suffered a peripheral visual field deficit of 50% in his left eye.

Dr. Vincent arrived at these opinions using patient history, examination, and objective and subjective testing. He stated that a loss of peripheral vision can be the result of optic nerve damage. Using perimetry testing to measure visual field deficit, Dr. Vincent found that plaintiff had a "superior arcuate defect or deficit in the left eye," which he explained is referred to as an arcuate defect because it looks like an arc. He described perimetry testing as similar to a video game where you press buttons when you see images. Dr. Vincent found this testing to be reliable but acknowledged that because perimetry testing is subjective, it involves patient input that relies on the patient's honesty and accuracy.

Dr. Vincent conducted repeated testing of plaintiff's eyes during numerous visits. Some testing was subjective, such as perimetry testing and confrontational testing. Other tests were objective, including optic coherence tomography (OCT) examination (described as "like an MRI of the eye," which measures the thickness of the nerve), CT scans, pupillary test (which measures pupillary function), color test, fundus test, and slit lamp test. These objective tests are used to measure visual acuity, described as an attempt to measure one's ability to look straight forward.

15

Dr. Vincent acknowledged on cross-examination that certain objective testing performed on plaintiff, including MRI, CT scans, pupillary testing, color testing, fundus testing and slit lamp testing, was not supportive of a diagnosis of an optic nerve injury. He admitted that it was rare to have an optic nerve injury with a normal pupillary test, as was the case with plaintiff. However, Dr. Vincent's opinion was even though the visual acuity testing did not confirm an optic nerve injury, it also did not preclude it. He stated that someone can have an optic nerve injury with negative objective testing and that visual acuity can be maintained despite an optic nerve injury.

Defendant offered the testimony of Dr. Rod Foroozan, who was accepted by the trial court as an expert in the field of neuro-ophthalmology. Dr. Foroozan was retained by counsel for defendant to conduct an independent medical examination. Dr. Foroozan did not examine plaintiff but reviewed his medical records.

He testified that he did not accept the opinion of Dr. Vincent that there was evidence that plaintiff suffered a traumatic optic neuropathy causing substantial visual loss in his left eye. His opinion was that there was no evidence to conclude that there was an optic neuropathy present. He testified that certain findings have to be present in order for there to be an optic neuropathy. The four objective tests he named were 1) relative afferent pupillary defect test (testing how brisk or sluggish the pupil reacts to light); 2) color vision testing (testing impairment in color vision; 3) testing for an abnormal-appearing optic nerve (examining the back of the eye to determine whether there is evidence of damage); and 4) optical coherence tomography – OCT test (using a laser light to take a photo of the eye to determine whether there is evidence of damage). Dr. Foroozan testified that if results from these four tests are normal – which he said they were in the case of

16

plaintiff – then there is no indication of optic neuropathy. He stated that perimetry testing is purely subjective and relies on the patient being truthful. After being questioned about white matter appearing on MRIs taken of plaintiff's brain in April 2021 and December 2022, Dr. Foroozan stated that these findings were not related to injuries suffered by plaintiff in the altercation at issue.

Dr. Foroozan's opinion was that the testing on plaintiff did not show the necessary findings to support a diagnosis of an optic nerve injury.

Dr. Vincent and Dr. Foroozan had conflicting opinions as to one of the OCT tests administered by Dr. Vincent. Dr. Vincent stated that this test was supportive of his diagnosis, whereas Dr. Foroozan stated that all of the OCT testing was within normal range.

Dr. Andrew Lawton was also accepted by the trial court as an expert in the field of neuro-ophthalmology. He examined plaintiff at the request of Lowe's. He administered tests and opined that plaintiff did not sustain a traumatic optic nerve injury.

On the issue of mental anguish suffered by plaintiff as a result of this incident, plaintiff testified that he has felt anxious, angry and depressed. He sought counseling for nervousness caused by being attacked by someone wearing a mask, and that this nervousness continued as he encountered people wearing masks after the incident. The records from the counseling center where he sought treatment state that he was treated for anxiety, depression and post-traumatic stress disorder. He testified that he still has days where he feels withdrawn because of the incident. His wife testified that in the two years between the incident and the trial, her husband has suffered from mood changes and is depressed about his injuries.

Based on the amount of the general damages awarded by the jury, we conclude that it is reasonable to assume the jury found that plaintiff did not prove that he suffered a traumatic eye injury in the incident at Lowe's. The jury obviously credited the opinions of Drs. Foroozan and Lawton over the opinion of Dr. Vincent and the testimony of plaintiff on this issue. Given the conflicting testimony and other evidence on this issue, we find the jury's credibility determinations were reasonable.

We find that the record taken as a whole shows that as a result of the altercation, plaintiff suffered a scalp laceration that required staples, headaches associated with a scalp injury and minor soft tissue injuries to his shoulder, back, hip and wrist that resolved in one or two months.

In *Higgins v. American Nat'l General Ins. Co.*, 2001-193 (La.App. 5 Cir. 9/25/01), 798 So.2d 1078, a total general damages award of $25,000 for physical and mental pain and suffering was affirmed for head and scalp injuries painful to touch for two months and a bruised abdomen that resolved quickly. In *Le v. Nitetown, Inc.*, 2010-1239 (La.App. 3 Cir. 7/20/11), 72 So.3d 374, a plaintiff's award of general damages for a scalp laceration with sutures and surrounding hematoma was increased to $5,000.00. In *Prejean v. State Farm Mut. Auto. Ins. Co.*, 2015-499 (La. App. 3 Cir. 1/6/16), 183 So.3d 823, 831-32, plaintiff's general damages award of $4,000.00 for headaches, migraines and lower backaches was found to not be an abuse of discretion. In *McCullin v. U.S. Agencies Cas. Ins. Co.*, 34,661 (La. App. 2 Cir. 5/9/01), 786 So. 2d 269, 277, the court found no abuse of discretion for a general damages award of $7,000 for a plaintiff who sustained soft tissue injuries in her shoulder, back and neck, from which she fully recovered in two months except for occasional shoulder pain. In *Dowden v. Cutright*, unpub.,

2013-747 (La. App. 3 Cir. 12/11/13), a total general damages award of $20,000 for both physical pain and suffering and mental anguish was found to not be an abuse of discretion where plaintiff's injuries from an altercation resulted in a broken rib, numerous contusions and abrasions, and a broken tooth.

"The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration." *Willis v. Noble Drilling (US), Inc.*, 2011-598, p. 19 (La. App. 5 Cir. 11/13/12), 105 So.3d 828, 845. After consideration of prior awards in other cases for injuries similar to those suffered by plaintiff together with the particular facts of this case, we conclude that the total general damages award of $40,000 for plaintiff's past, present and future pain and suffering and past, present and future mental anguish was not an abuse of discretion.

Finally, as stated above, the jury did not award plaintiff damages for enjoyment of life. Loss of enjoyment of life has been defined by the Louisiana Supreme Court as the detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life that were formerly enjoyed. *McGee v. A C And S, Inc.*, 2005-1036, p. 3 (La. 7/10/06), 933 So.2d 770, 773.

On this issue, the jury heard testimony from plaintiff that stress from injuries suffered in the incident has affected his everyday life and that he has difficulty staying focused on tasks he needs to perform. As with his claim for mental anguish, he contends because defendant was wearing a mask during the incident, he was afraid to go out in public when Covid-related mask requirements were still in place. He described problems with sleep and weight loss that he claims were due to the incident.

19

The jury also heard testimony about plaintiff taking vacation trips to Disney World and to the Dominican Republic between the time of the incident and trial. He has continued to go out for weekly dinners with his wife. He bought a motorcycle shortly after the incident, which he claimed at trial that he only rode once or twice before selling. He continues to help his wife with the family business and has continued to check on construction of a house and office building that he and his wife are building.

The jury was in the best position to determine the credibility of plaintiff, and came to the conclusion that plaintiff did not prove that the incident at Lowe's caused him to suffer a loss of enjoyment of life. The trial court's decision to accept that finding was not an abuse of discretion.

We find no merit in the arguments that there was any abuse of discretion in the awards of general damages for plaintiff's injuries.

Accordingly, for the reasons stated above, the trial court judgment is affirmed.

**AFFIRMED**